**CONSOLIDATION COAL COMPANY,
Petitioner,**

v.

**Douglas M. COSTLE, as Administrator,
Environmental Protection Agency,
Respondent.***

Nos. 76–1690, 76–1859, 76–1862, 76–1912, 76–1981, 76–1982, 76–2019, 76–2020, 76–2059, 76–2145 to 76–2147, 77–1474, 77–1490, 77–1491, 77–1534, 77–1592 to 77–1594, 77–1828, 77–1845, 77–1892, 77–1893, 77–1957, 77–1989, 77–1990 and 77–2088.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 5, 1978.

Decided June 25, 1979.

* *Bethlehem Steel Corp. v. Costle; National Coal Assn. v. Costle; West Virginia Citizen Action Group v. Peabody Coal Co.; Gibralter Coal Corp. v. Costle; Amax, Inc. v. Costle; Drummond Co. v. Costle; Save Our Cumberland Mountains, Inc. v. Costle; North American Coal Corp. v. Costle; National Steel Corp. v. Environmental Protection Agency; Republic Steel Corp. v. Environmental Protection Agency; U. S. Steel Corp. v. Environmental Protection Agency; National Coal Assn. v. Costle; Consolidation Coal Co. v. Costle; Bethlehem Steel Corp. v. Costle; Drummond Company v. Costle; National Steel Corp. v. Costle; Republic Steel Corp. v. Costle; U. S. Steel Corp. v. Costle; Peabody Coal Co. v. Environmental Protection Agency; West Virginia-Citizen Action Group, Inc. v. Costle; Save our Cumberland Mountains, Inc. v. Costle; North American Coal Corp. v. Costle; Cedar Coal Co. v. Environmental Protection Agency; Amax, Inc. v. Costle; Gibraltar Coal Corp. v. Costle; Commonwealth of Pennsylvania v. Environmental Protection Agency*

George C. Freeman, Jr., Richmond, Va. (Michael B. Barr, Hunton & Williams, Richmond, Va., on brief), for National Coal Association.

Theodore L. Garrett, Washington, D. C. (Covington & Burling, Washington, D. C., on brief), for Cedar Coal Company, Central Appalachian Coal Company, Central Coal Company, Central Ohio Coal Company, Southern Appalachian Coal Company, Southern Ohio Coal Company and Windsor Power House Coal Company.

Lawrence A. Demase, Pittsburgh, Pa. (Michael G. Kushnick, Washington, D. C., Ronald S. Cusano, Rose, Schmidt, Dixon, Hasley & Whythe, Pittsburgh, Pa., on brief), for Consolidation Coal Company and Bethlehem Steel Corporation.

Patrick McGinley, Pittsburgh, Pa. (John Philip Williams, East Tennessee Research Corporation, Lafollette, Tenn., on brief), for Citizen Environmental Group, petitioners.

K. W. James Rochow, Asst. Atty. Gen., Harrisburgh, Pa. (Gary Waxman, Asst. Atty. Gen., Harrisburgh, Pa., on brief), for Commonwealth of Pennsylvania, Department of Environmental Resources.

James A. Rogers, Associate Gen. Counsel, Environmental Protection Agency, Washington, D. C. (Joan Z. Bernstein, Gen. Counsel, Environmental Protection Agency, James W. Moorman, Asst. Atty. Gen., Angus Macbeth and Lee R. Tyner, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Robert F. Stauffer, Gen. Counsel, Washington, D. C., on brief, for National Coal Association.

Thos. E. Cahill, Evansville, Ind., and Thomas F. Linn, St. Louis, Mo., on brief, for Peabody Coal Company.

George L. Raymond, Indianapolis, Ind., on brief, for AMAX, Inc. and Gibralter Coal Corporation.

Peter G. Veeder, Frank J. Clements, Thorp, Reed & Armstrong, Pittsburgh, Pa., on brief, for National Steel Corporation, Republic Steel Corporation and United States Steel Corporation.

William B. Long, Tuscaloosa, Ala., on brief, for The Drummond Company.

Jerry A. Fullmer, Ronald R. Janke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, on brief, for The North American Coal Corporation.

Before BUTZNER, WIDENER and HALL, Circuit Judges.

BUTZNER, Circuit Judge:

In 27 consolidated cases, 17 coal producers, their trade association, 5 citizens' environmental associations, and the Commonwealth of Pennsylvania seek review, pursuant to 33 U.S.C. § 1369(b)(1)(E), of water pollution control regulations for existing facilities in the coal industry promulgated by the administrator of the Environmental Protection Agency.[1] We uphold the regulations with the exception of a clause establishing criteria for variances.

## I

The Federal Water Pollution Control Act of 1972 is a legislative mandate to restore and maintain the chemical, physical, and biological integrity of the nation's waters.[2] The Act sets a national goal to eliminate the discharge of pollutants into the navigable waters by 1985.[3]

As the first step toward the 1985 goal,[4] Congress provided in § 301(b)(1)(A) of the Act[5] that

there shall be achieved . . . not later than July 1, 1977, effluent limitations for point sources [of water pollution], other than publicly owned treatment works, (i) which shall require the

application of the best practicable control technology currently available as defined by the Administrator [of the Environmental Protection Agency] pursuant to § 304(b) . . . .

This provision for effluent limitations marked a major change from prior law. Before the 1972 Act, water pollution control had been based upon water quality standards specifying the acceptable levels of pollution in the navigable waters. The program proved ineffective in part because the standards focused on the tolerable effects rather than the preventable causes of water pollution. Effluent limitations eliminate this problem because they directly restrict the concentrations of pollutants that may be discharged by any plant in a given industrial subcategory.[6]

Section 304(b)(1)[7] requires the Administrator to publish regulations which must

identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources . . . and specify factors to be taken into account in determining the control measures and practices to be applicable to point sources . . . within such categories or classes.

The administrator promulgated final water pollution control regulations for existing plants in the coal industry on April 26, 1977.[8] The regulations divide the industry into two categories—(1) coal mines and (2) coal preparation plants and associated

---

1. See E. I duPont de Nemours & Co. v. Train, 430 U.S. 112, 136, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), for a discussion of the jurisdiction of courts of appeals to review these regulations.

2. 33 U.S.C. §§ 1251–1376.

3. 33 U.S.C. § 1251(a).

4. The Act contemplates a two-phase reduction in pollutant discharges. Second-phase standards (§ 301(b)(2) [33 U.S.C. § 1311(b)(2)]) are not in issue here.

5. 33 U.S.C. § 1311(b)(1)(A).

6. EPA v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 202–05, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

7. 33 U.S.C. § 1314(b)(1).

8. 42 Fed.Reg. 21380–21390 (April 26, 1977), adding certain parts of 40 C.F.R. Part 434. Regulations governing "new source" coal production facilities were promulgated separately and are not before us in these cases. See 44 Fed.Reg. 2586–2592 (Jan. 12, 1979).

areas. These categories are each subdivided according to acidic and alkaline discharges. For each of the resulting subcategories, the regulations establish maximum concentrations of iron and total suspended solids. They also limit the permissible range of acidity and alkalinity of discharge water, and they restrict manganese concentrations in acidic drainage. None of the petitions before us challenges these maxima.[9] The petitions question the validity of seven aspects of the regulations which we will discuss in parts II–VIII of this opinion.

Our review is governed by § 10(e)(2) of the Administrative Procedure Act.[10] We must set aside any portion of the 1977 effluent limitations that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" is in excess of statutory authority; or is "without observance of procedure required by law."[11] The ultimate standard of review is narrow. This court is not empowered to substitute its judgment for that of the agency.[12] The Federal Water Pollution Control Act is to be given the broadest possible reading consistent with the commerce clause,[13] and ambiguities as to the administrator's powers under the Act are to be resolved in his favor.[14] Congress has required the agency to act quickly and decisively despite a recognized absence of exact data on pollution control technology, and we must hesitate to draw substantive conclusions differing from those of the agency in this area of imprecise knowledge. An overly expansive exercise of the judicial review power can impede accomplishment of the Act's goal of eliminating water pollution and thwart its requirement of national uniformity in effluent reduction technology.[15]

## II. Variance—Statutory Factors

The industrial petitioners challenge the "fundamentally different factors" variance clause contained in the regulations [16] complaining that this provision fails to require the permit issuer to consider the factors set forth in §§ 304(b)(1)(B) [17] and 301(c) [18] of the Act.

9. The administrator's brief states that this is the first case brought to review best practicable control technology standards in which the numerical national limitations have not been attacked.

10. 5 U.S.C. § 706(2). *See Weyerhaeuser Co. v. Costle,* 190 U.S.App.D.C. 309, 322–26, 590 F.2d 1011, 1024–28 (1978); *see generally* D. Currie, Judicial Review under Federal Pollution Laws, 62 Iowa L.Rev. 1221 (1977).

11. 5 U.S.C. § 706(2); *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

12. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814.

13. *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir. 1978); *Minnesota v. Hoffman,* 543 F.2d 1198, 1200 n.1 (8th Cir. 1976).

14. *E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 128, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); *Inland Steel Co. v. EPA,* 574 F.2d 367, 373 (7th Cir. 1978).

15. *Weyerhaeuser Co. v. Costle,* 190 U.S.App. D.C. at 323, 590 F.2d at 1025.

16. The variance clause, contained in 40 C.F.R. §§ 434.22, 434.32, and 434.42 (1977), provides:
    In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence . . . that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. . . . If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations . . . either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors.

17. 33 U.S.C. § 1314(b)(1)(B). This section provides in pertinent part that
    factors relating to the assessment of best practicable control technology currently

18. See note 18 on p. 244.

An identical variance clause was before the court in *National Crushed Stone Association v. EPA,*[19] which controls our disposition of this issue. *National Crushed Stone* holds that the clause is unduly restrictive, relying on *Appalachian Power Co. v. EPA.*[20] Accordingly, we set aside the variance clauses contained in 40 C.F.R. §§ 434.22, 434.32, and 434.42 and remand them for revision to conform with *National Crushed Stone.*

### III. Variance—Environmental Benefits

The industrial petitioners also insist that the regulations dealing with variances must be disapproved because they fail to require the agency to consider the environmental benefits of applying the effluent limitations to a particular source of pollution. The only specific error they attribute to the regulations is the absence of a provision requiring the agency to take into account the quality of the receiving water when it decides whether to grant a variance.

At the outset, we reject the agency's argument that consideration of this aspect of the variance regulations would be premature. In a recent adjudicatory proceeding, the administrator unequivocally ruled that the Act and, consequently, the regulations, do not authorize him to grant a variance to an industrial discharger by providing "relief from technology-based effluent limitations guidelines due solely to the characteristics

of particular receiving waters . . . ."[21] Since the administrator's interpretation of the regulations precludes any speculation about its meaning, review is not premature.[22] We therefore turn to the merits of the petition.

The pertinent regulations authorize the administrator to allow deviations from the national effluent limitations if factors peculiar to a specific source of pollution are fundamentally different from the factors considered in the establishment of the guidelines.[23] The precise issue, therefore, is whether the factors peculiar to a source of pollution must include comparison of the expected improvements in the receiving water with the cost of achieving them. We dealt with this issue in *Appalachian Power,*[24] where, in response to Consolidated Edison's request to be relieved of the effluent guidelines, we said:

> [S]o far as its petition may be read as a request for leniency because of the already polluted condition of the harbor, it must be rejected. The 1972 amendments to the statute changed the system from that of control of the quality of the body of water to effluent limitations as we have before noted.

The Court of Appeals for the District of Columbia Circuit also examined this issue in *Weyerhaeuser Co. v. Costle,*[25] and affirmed the administrator's refusal to consider receiving water quality in setting limitations.

---

available to comply with subsection (b)(1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

**18.** 33 U.S.C. § 1311(c). This section provides that the Administrator may modify the 1984 second-stage pollution control requirements upon a showing by the owner or operator of [a] point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technolo-

gy within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

**19.** 601 F.2d 111 (4th Cir. 1979).

**20.** 545 F.2d 1351 (4th Cir. 1976).

**21.** *In re Louisiana-Pacific Corp.,* 10 E.R.C. at 1854.

**22.** *See Appalachian Power,* 545 F.2d at 1359.

**23.** *See* n.16, *supra.*

**24.** 545 F.2d at 1378.

**25.** 190 U.S.App.D.C. 309, 339–42, 590 F.2d 1011, 1041–44 (1978).

These decisions recognize that after many years of experimenting with pollution control laws, Congress determined that emphasis on receiving water quality instead of effluent reduction technology was unacceptable for control of private sources of pollution. With exceptions not germane to this opinion, Congress has now mandated that even if the application of the best practicable control technology to a specific source of pollution results in no significant improvement in the quality of the receiving water, that technology must still be applied. Commenting on the change in the scheme for elimination of pollution, the Supreme Court said:

> [A] discharger's performance is now measured against strict technology-based effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to which it and other polluters must collectively conform.[26]

Any possible doubt about congressional intent to preclude consideration of receiving water quality in industrial variance rulings was put to rest in 1977. While considering legislation necessary for mid-course corrections in the federal water pollution control program, Congress heard evidence about the asserted inequity of technology-based standards.[27] In the resulting amendments,[28] Congress permitted consideration of receiving water quality as a basis for less stringent discharge standards in one situation: discharges from publicly owned treatment works into marine waters.[29] The intent to restrict this exception to municipalities is clear from the amendments and their legislative history.[30]

■ We therefore conclude that the variance regulations as interpreted by the administrator properly exclude consideration of the quality of the receiving water. We recognize, however, that elements of the environment apart from receiving water may be affected by enforcement of the effluent limitations, and in an appropriate case, these elements might warrant a variance.[31]

## IV. Deadline

■ The industrial petitioners next argue that because the standards for the coal industry were promulgated barely two months before the statutory deadline for application of the best practicable control technology, they are in part unachievable, and therefore invalid, as to certain facilities. The petitioners suggest that the July 1, 1977, deadline for compliance with effluent limitations[32] may not be enforced because the administrator did not promulgate final regulations until long after the Act required him to do so.[33]

---

26. *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. at 204–05, 96 S.Ct. at 2024–2025, 48 L.Ed.2d 578.

27. *See, e. g.,* Federal Water Pollution Control Act Amendments of 1977, Hearings Before the Subcomm. on Environmental Pollution of the Senate Comm. on Environment and Public Works, 95th Cong., 1st Sess., Par. 10 at 540–41 (1977).

28. Act of Dec. 27, 1977, Pub.L. 95–217, 91 Stat. 1567, amending 33 U.S.C. (Clean Water Act of 1977).

29. *See* 33 U.S.C. § 1311(h).

30. *See* 33 U.S.C. § 1311(h); S.Rep.No. 95–370 on S. 1952, 95th Cong., 1st Sess. 45, 1977 U.S. Code Cong. & Admin.News, pp. 4326, 4370. The only provision for less stringent discharge standards based upon receiving water quality in the 1972 Act pertained to thermal discharges, which are not in issue here. *See* 33 U.S.C. § 1326(a); *In re Louisiana-Pacific Corp.,* 10 E.R.C. at 1848–50. In all other respects, the 1972 Act allowed consideration of receiving water quality only as a basis for standards that are more stringent than the technology-based effluent limitations. *See, e. g.,* 33 U.S.C. §§ 1311(b)(1)(C), 1312, 1313, 1316(c).

31. In *In re Louisiana-Pacific Corp.,* 10 E.R.C. at 1853 n.30, the administrator observed: "There is no reason why, in a proper case, a fundamental difference in non-water quality environmental impact could not justify a variance." *See* 33 U.S.C. § 1314(b)(1)(B).

32. *See* § 301(b)(1)(A) [33 U.S.C. § 1311(b)(1)(A)].

33. *See* § 304(b) [33 U.S.C. § 1314(b)]; *but see Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 325–326, 510 F.2d 692, 705–06 (1975).

Congress addressed this problem when it passed the 1977 amendments to the Act. Section 309(a)(5)(B),[34] added by those amendments, authorizes the administrator to extend the deadline up to April 1, 1979, for companies that, despite good faith efforts to comply with the best practicable control technology standards, were unable to do so by July 1, 1977. This new provision speaks in general terms of persons who have violated the Act or who otherwise have not complied with its requirements. It does not specifically mention compliance problems caused by the administrator's delay in promulgating effluent limitations guidelines. Nevertheless, the legislative history establishes that the amendment is intended to afford relief in such situations to companies that satisfy its requirements.[35]

Industry also contends that an extension pursuant to § 309(a)(5)(B) will not prevent suits by private citizens pursuant to § 505 of the Act[36] against companies that are unable to meet the statutory deadline. The courts, however, retain equitable discretion to determine whether and to what extent sanctions should be allowed against coal operators who qualify for relief under the amendment.[37]

Congress has adequately dealt with any dilemma that may confront a coal operator due to the agency's delay. Accordingly, the regulations are not invalidated by the short lead time.

## V. Western Coal Mines

The industrial petitioners next challenge the administrator's decision to exclude mines in six western states from the coverage of the maximum total suspended solids level applicable to mine drainage. Concerned that the administrator will promulgate more stringent standards for the western mines, the petitioners emphasize two assignments of error. First, they assert that the postponement of suspended solids limitations for the western mines violates the Act's requirement of uniformity in effluent limitations. Second, they point out that the limits for suspended solids, as proposed in 1976, applied to all mines in the country. They assert that they were not given adequate notice or opportunity to comment on the Agency's exclusion of these six states in its final regulations, in violation of the Administrative Procedure Act[38] and sections 101(e) and 304 of the Federal Water Pollution Control Act.[39]

The agency's interim effluent limitations guidelines, published October 17, 1975,[40] and May 13, 1976,[41] dealt with total suspended solids on a national, rather than regional, basis. The interim guidelines prescribed a maximum limitation for any one day of 70 milligrams of total suspended solids per liter of water (mg/1) and a maximum average daily value for 30 consecutive days of 35 mg/1. The final regulations, promulgated April 26, 1977, retain these values, but

---

**34.** 33 U.S.C. § 1319(a)(5)(B). As explained in the Senate committee report:

> [t]he extension would be available only when the Administrator determines that the discharger acted in good faith; that a serious commitment to achieve compliance had been made by the discharger; that compliance would occur no later than January 1, 1979; that the extension would not result in other sources having to achieve additional controls; that the application for a permit was filed prior to December 31, 1974; and that the necessary facilities for abatement are under construction.

S.Rep.No. 95–370 on S. 1952, 95th Cong., 1st Sess. 61, 1977 U.S.Code Cong. & Admin.News, p. 4386.

**35.** *See* 123 Cong.Rec. S 19650 (daily ed., Dec. 15, 1977) (remarks of Sen. Muskie, the chairman of the drafting subcommittee); S.Rep.No. 95–370 on S. 1952, 95th Cong., 1st Sess. 61–62,

1977 U.S.Code Cong. & Admin.News, pp. 4385–4387; *Monongahela Power Co. v. EPA,* 586 F.2d 318, 12 E.R.C. 1440 (4th Cir. 1978); *Republic Steel Corp. v. Costle,* 581 F.2d 1228 (6th Cir. 1978); *cf. State Water Control Board v. Train,* 559 F.2d 921, 927–28 (4th Cir. 1977).

**36.** 33 U.S.C. § 1365.

**37.** *State Water Control Board v. Train,* 559 F.2d 921, 927–28 (4th Cir. 1977); *accord, Weyerhaeuser Co. v. Costle,* 11 E.R.C. at 2185 n.86.

**38.** 5 U.S.C. § 553.

**39.** 33 U.S.C. §§ 1251(e), 1314.

**40.** 40 Fed.Reg. 48830.

**41.** 41 Fed.Reg. 19832.

provide that the national suspended solids limitations do not apply in Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming. In these states, the agency ruled, total suspended solids limitations will be determined on a case-by-case basis.[42] In the preamble to its final regulations, published April 26, 1977,[43] the agency explained its reasons for excluding these western states as follows:

> *Western Coal Mines.* The Effluent Guidelines Division of EPA has received a substantial body of information from EPA Region VIII (located in Denver, Colorado) with respect to the limitations on discharges from coal mines in the Western United States. Representatives of that Region believe more stringent numbers are appropriate in light of actual experiences with those mines. These data appear to support effluent limitations guidelines for a number of parameters significantly more stringent than the limitations announced today. The reasons for the apparent ability of Western coal mines to discharge pollutants in less concentration than is the case of Eastern coal mines are many, and certainly include the relatively more even topography of Western coal mines, the emphasis on recycle of relatively scarce water supplies, and the relatively lower concentration of pollutants in the geologic formations being exploited. The Agency is undertaking a thorough evaluation of the information being supplied from permit-granting authorities in the Western United States. It is anticipated that consideration will be given to proposal of a separate subcategory with respect to all pollutant parameters for those coal mining operations located in the Western United States which have attributes such that they are able to meet more stringent effluent limitations.

The Agency has determined not to promulgate national TSS limitations for mines in some Western States. Until national limitations guidelines are published which address Western mines and TSS, NPDES permit writers shall calculate TSS restrictions utilizing the same discretion and with the same deference to statutory factors as they have in the past.

We find no violation of the Act. In the first place, we note that the administrator has not exempted these mines from applying the best practicable technology to reach prescribed effluent limitations. Doing so would have violated the Act.[44] In contrast to outright exemption, the Act authorizes the administrator to create appropriate subcategories and to consider a broad range of factors when establishing the standards for facilities within such subcategories.[45] Thus, the Act does not prohibit the administrator from creating a subcategory based on geographic location if geological, topographical, or other technical factors justify it.

The administrator, however, has not utilized the Act to create a formal subcategory for the western mines. The issue therefore is whether the administrator has authority to take an interim step toward creating a subcategory by declining to apply the total suspended solid effluent limitations to a designated region pending further study.

While the resolution of the question is not free from doubt, we believe the administrator is empowered to defer establishment of the suspended solids limitation for mines in the western states. The information that the administrator received during the rulemaking proceedings indicated that, with the same pollution control equipment, western mines could be operated with more stringent limitations on the discharge of suspended solids than the eastern mines. There is therefore no apparent technological justification for applying the limitations

---

42. 40 C.F.R. §§ 434.32(a) and 434.42(a) (footnote 1 to effluent limitations table).

43. 42 Fed.Reg. 21382–21383.

44. *Cf. American Iron & Steel Institute v. EPA,* 568 F.2d 284, 294–95, 306–08 (3d Cir. 1977).

45. *See* § 304(b)(1) [33 U.S.C. § 1314(b)(1)]; *E. I. duPont de Nemours & Co. v. Train,* 430 U.S. at 131 n.21, 97 S.Ct. 965, 51 L.Ed.2d 204; *Weyerhaeuser Co. v. Costle,* 190 U.S.App.D.C. at 351, 590 F.2d at 1053.

that were appropriate for the rest of the country.

At the same time, the agency had not received and studied sufficient data to create a separate subcategory with specific limitations. Consequently, the administrator applied to the western mines all national criteria except the single limitation for which he lacked sufficient data. He then temporarily authorized state and federal officials to set levels of suspended solid effluents on a case-by-case basis.[46] This practice will generally require the western mines to continue to conform to more strict suspended solids limitations than those for eastern mines during the administrator's study of the data.

■ Referring to an analogous issue concerning the same statute, Judge Leventhal cautioned courts to exercise restraint for reasons that are pertinent here:

> The courts cannot responsibly mandate flat guideline deadlines when the Administrator demonstrates that additional time is necessary to insure that the guidelines are rooted in an understanding of the relative merits of available control technologies. The delay required to give meaningful consideration to the technical intricacies of promising control mechanisms may well speed achievement of the goal of pollution abatement by obviating the need for time-consuming corrective measures at a later date.[47]

A regulatory agency frequently needs to address problems step by step. It should not always be required to answer every question simultaneously.[48] The administrator's deferral of limitations for suspended solids in the west pending further study was prudent and lawful.

The petitioners also point out that the limits on suspended solids, when initially promulgated in the notice of rulemaking, applied to all mines, and they protest that they were not given adequate opportunity to comment on the agency's exclusion of the western mines in its final regulations. They argue that this omission violated the notice and comment provisions of the Administrative Procedure Act[49] and the requirement of public participation found in the Federal Water Pollution Control Act.[50]

■ A notice of proposed rulemaking " 'must be sufficient to fairly apprise interested parties of the issue involved . . ,' but it need not specify 'every precise proposal which [the agency] may ultimately adopt as a rule.' "[51] Moreover, "[t]he requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions."[52]

■ Tested by these familiar principles, the administrator's procedure fully complied with both statutes.[53] The Federal Water Pollution Control Act placed the industrial petitioners on notice that individual discharge permits might contain suspended

---

**46.** Section 402(a)(1) of the Act [33 U.S.C. § 1342(a)(1)] gives the administrator the power to issue effluent limitations on a case-by-case basis "prior to the taking of necessary implementing actions relating to" requirements under §§ 301, 302, 306, 307, 308, and 403 of the Act. Sections 402(b)–(c) [33 U.S.C. §§ 1342(b)–(c)] allow for issuance of permits on a case-by-case basis by state authorities, subject to veto by the administrator under § 402(d)(2) [33 U.S.C. § 1342(d)(2)]. A discharger is free to challenge the terms of a permit issued by the administrator, or the administrator's veto of a state-issued permit, in a court of appeals. 33 U.S.C. § 1369(b)(1)(D)–(F).

**47.** *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. at 332, 510 F.2d at 712.

**48.** *See Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. at 325–332, 510 F.2d at 705–12.

**49.** 5 U.S.C. § 553.

**50.** §§ 101(e), 304 [33 U.S.C. §§ 1251(e), 1314].

**51.** *Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 449, 564 F.2d 458, 470 (1977).

**52.** *International Harvester Co. v. Ruckelshaus*, 155 U.S.App.D.C. 411, 428, 478 F.2d 615, 632 (1973).

**53.** *See* notes 49 and 50, *supra*.

solids standards that were more stringent than the national limitations.[54] The administrator's 1975 notice of interim rulemaking advised that effluent limitations would take account of total suspended solids; that the agency had considered geographic locations during its study of effluents; that the quality of raw water discharged from coal mining activities varies significantly; and that regional geology may be a determinant of the variations.[55] Therefore, it is apparent that the administrator's deferral of a limitation for suspended solids for the western mines pending further study dealt with problems that were mentioned in the notice. Moreover, the final regulations did not require the western mines to cease the discharge of any pollutant other than those mentioned in the notice. In this respect the administrator's action differs from procedures that were criticized in cases on which the petitioners rely.[56]

For all of these reasons, we conclude that the exclusion of the mines in the western states does not invalidate the suspended solids limitation.

### VI. Coal Preparation Plants

The industrial petitioners' final complaint concerns the regulations dealing with coal preparation plants and associated areas. They claim that these regulations are impermissibly vague; that they fail to distinguish between point sources and non-point sources; and that they do not adequately notify mining companies which of their activities are covered.

The Act restricts the administrator's authority to the regulation of discharges from point sources.[57] Non-point sources are subject only to analysis, study, and publication of information.[58] The Act defines a point source as follows:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, [or] rolling stock . . . from which pollutants are or may be discharged.[59]

This definition excludes unchanneled and uncollected surface waters.[60]

The regulations under attack establish the concentration of specific pollutants "which may be discharged by a point source"[61] after application of best practicable control technology. They define a point source in conformity with the statute.[62] Their definitions of coal preparation plant and coal preparation plant associated areas are as follows:

> The term "coal preparation plant" means a facility where coal is crushed, screened, sized, cleaned, dried, or otherwise prepared and loaded for transit to a consuming facility.[63]

> The term "coal preparation plant associated areas" means the coal preparation plant yards, immediate access roads, slurry ponds, drainage ponds, coal refuse

---

**54.** Section 301(b)(1)(C) of the Act [33 U.S.C. § 1311(b)(1)(C)] requires the agency to enforce any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 510 [33 U.S.C. § 1370]) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter. Section 304(a)(4) [33 U.S.C. § 1314(a)(4)] makes suspended solids a mandatory element of pollution control standards.

**55.** 40 Fed.Reg. 48831 (Oct. 17, 1975).

**56.** *See, e. g., American Frozen Food Institute v. Train,* 176 U.S.App.D.C. 105, 133, 539 F.2d 107, 135 (1976); *Maryland v. EPA,* 530 F.2d 215, 222 (4th Cir. 1975), *vacated and remanded on other grounds,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).

**57.** §§ 301(e), 304(b) [33 U.S.C. §§ 1311(e), 1314(b)]; *Appalachian Power,* 545 F.2d at 1373.

**58.** *See* § 304(f) [33 U.S.C. § 1314(f)].

**59.** § 502(14) [33 U.S.C. § 1362(14)].

**60.** *Appalachian Power,* 545 F.2d at 1373.

**61.** 40 C.F.R. §§ 434.22(a)–(b).

**62.** 40 C.F.R. § 401.11(d) (general definition, incorporated in these regulations by § 401.10).

**63.** 40 C.F.R. § 434.11(e).

piles, and coal storage piles and facilities.[64]

■ The subsection which the petitioners criticize as vague provides:

The provisions of this subpart are applicable to discharges from coal preparation plants and associated areas, including discharges which are pumped, siphoned or drained from coal storage, refuse storage and coal preparation plant ancillary areas related to the cleaning or beneficiation of coal of any rank including but not limited to bituminous, lignite and anthracite.[65]

The petitioners argue that this regulation could be interpreted to apply to surface runoff that does not fit within the statutory definition of a point source.

We do not share the petitioners' concern. The subsection about which the petitioners particularly complain, read in context with other pertinent parts of the regulations,[66] applies only to discharges from point sources. Stripped to its bare bones, the petitioners' complaint is directed at the statutory definition of a point source, which the agency is powerless to change. How the agency will apply its regulations to actual situations presents issues which cannot be satisfactorily resolved in the absence of a full factual background.[67] They can only be determined through the permit-issuing process, including the administrative and judicial review that is available to the petitioners.

We find no defect in the regulations for coal preparation plants and associated areas.

## VII.  Post-Mining Discharges

The Commonwealth of Pennsylvania and several citizens' environmental associations[68] petition for review of the administrator's exclusion of point source discharges from inactive surface mines during reclamation and revegetation and from underground mines after coal production ceases. These petitioners charge that the administrator's decision to exclude these aspects of the coal industry was arbitrary and capricious, and therefore illegal. They emphasize that the deadline imposed by Congress passed without the promulgation of any regulations for these discharges. Pennsylvania additionally complains that the absence, or even the postponement, of rules pertaining to post-mining discharges will hinder its regulation of inactive mines by encouraging the industry to concentrate its operations in states with lower environmental standards.

The administrator, supported on this occasion by the industrial petitioners, claims that he has insufficient data, particularly on costs in relation to benefits, to draft the necessary regulations. Pennsylvania and the environmental groups insist, however, that one of the agency's development documents,[69] the comments received by the agency during rulemaking,[70] and the laws and regulations of several states[71] disclose sufficient data for the promulgation of pertinent regulations.

The record amply supports the petitioners' claim that post-mining pollution abatement is an integral part of coal production. In two sections of the Act, Congress explic-

---

64.  40 C.F.R. § 434.11(f).

65.  40 C.F.R. § 434.20.

66.  See n.61, supra, and accompanying text.

67.  See Toilet Goods Association, Inc. v. Gardner, 387 U.S. 158, 163–66, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

68.  Save our Cumberland Mountains, Inc.; Citizens League to Protect the Surface Rights, Inc.; West Virginia Citizen Action Group, Inc.; Mountain Community Union, Inc.; and Save our Mountains, Inc.

69.  EPA, Development Document for Interim Final Effluent Limitations Guidelines and New

Source Performance Standards for the Coal Mining Point Source Category (May 1976).

70.  See, e. g., 42 Fed.Reg. 21383 (April 26, 1977).

71.  See, e. g., Ky.Rev.Stat. Chapter 350 (1978 Cum.Supp.); 35 Penna.Stat. § 691.1 et seq. (1978 Supp.); Commonwealth v. Barnes & Tucker Co., 472 Pa. 115, 371 A.2d 461 (1977). Also, according to EPA, the State of West Virginia has consistently certified that mines must continue to meet effluent limitations after release of the reclamation bond.

itly recognized the problem of polluted drainage from abandoned mines.[72] Coal mining, whether on the surface or underground, necessitates massive excavations that change the drainage characteristics of the land. Drainage of precipitation and surface water over coal waste—rather than water actually used for coal mining—causes the bulk of the water pollution from coal mines.[73] Ceasing active mining operations does not necessarily reduce water pollution from the site. Pollution may continue indefinitely or even increase in intensity if proper mining methods and control technology are not employed.[74] Pollution from post-mining sites may come from point source discharges.[75]

Much of our discussion in Part V about the western coal mines is pertinent to this issue. The administrator cannot exempt post-mining point source discharges from the application of the best practicable control technology. Section 301(e) of the Act requires that pertinent effluent limitations must be applied to all point sources without exception.[76] The administrator may, however, subcategorize the coal industry for the purpose of prescribing effluent limitation guidelines under § 304(b).[77]

Here, the administrator has created a subcategory for active mines. He accomplished this by defining a coal mine as "an active mining area." [78] This phrase was defined in turn as follows:

[A] place where work or other activity related to the extraction, removal, or re-

covery of coal is being conducted, except, with respect to surface mines, any area of land on or in which grading has been completed to return the earth to desired contour and reclamation work has begun.[79]

To eliminate any question about the exclusion of post-mining operations the regulations also provide:

Drainage which is not from an active mining area shall not be required to meet [these] limitations . . . as long as such drainage is not commingled with untreated mine drainage which is subject to the limitations . . .[80]

The administrator rightly decided that regulations for active mines might prove to be inappropriate for inactive mines. Indeed, Congress has demonstrated its belief that inactive mines require pollution controls that are quite different from those for active mines. By enacting the Surface Mining Control and Reclamation Act of 1977,[81] Congress recognized that the Federal Water Pollution Control Act is inadequate to eliminate pollution from inactive mines. The surface mining act addresses many of the issues raised by the environmental groups and Pennsylvania. It requires a surface mine operator to restore vegetation, prevent erosion, and curtail water pollution after active mining has ceased.[82] It also requires underground mine operators to take specified measures during and after mining to reduce water pollution.[83]

---

72. §§ 107 and 304(f)(2)(B) [33 U.S.C. §§ 1257 and 1314(f)(2)(B)]. Both sections, however, provide only for study, analysis, and demonstration projects.

73. Unlike coal preparation plants and plants in certain manufacturing industries, coal mining does not use water as part of the process, except in small quantities for dust control and fire prevention. Appendix B to final regulations, 42 Fed.Reg. 21387 (April 26, 1977).

74. *See* 42 Fed.Reg. 21387 (April 26, 1977).

75. *See* 42 Fed.Reg. 21383, 21387 (April 26, 1977).

76. 33 U.S.C. § 1311(e); *see American Iron and Steel Institute v. EPA*, 568 F.2d 284, 306–08 (3d Cir. 1977).

77. *See* text and cases cited at n.45, *supra.*

78. 40 C.F.R. § 434.11(d).

79. 40 C.F.R. § 434.11(b).

80. 40 C.F.R. §§ 434.32(c), 434.42(c).

81. Act of August 3, 1977, Pub.L. 95–87, 91 Stat. 447, codified as 30 U.S.C. §§ 1201–1328.

82. § 515 of the surface mining act [30 U.S.C. § 1265].

83. § 516 of the surface mining act [30 U.S.C. § 1266].

■ Since we have concluded that the administrator acted properly in treating active mines as a subcategory that excluded inactive mines, the remaining issue becomes quite narrow. It is whether, in view of the administrator's failure to meet the deadline for promulgating regulations dealing with post-mining discharges, we should remand the regulations for prompt inclusion of inactive mines. The administrative record established that techniques for reducing pollution from inactive mines are generally known in the industry and that they are successfully utilized by some mining companies. The record, however, does not disclose data concerning the "total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application." The agency must consider this information in assessing the best practicable control technology currently available.[84]

■ The passage of the Surface Mining Control and Reclamation Act of 1977 also must be taken into account in determining whether the administrator acted arbitrarily by deferring regulation of post-mining discharges. That statute does not supersede or modify the Federal Water Control Pollution Act;[85] therefore, the administrator remains responsible for promulgating regulations concerning effluent limitations for point source discharges from post-mining areas in accordance with §§ 301 and 304 of the water pollution control act.[86] But the surface mining act requires the Environmental Protection Agency to cooperate "[t]o the greatest extent practicable" with the Secretary of the Interior.[87] Conversely, the Secretary is also required to cooperate with the agency.[88] The purpose of this cooperation is "to minimize duplication of inspections, enforcement and administration."[89] We therefore conclude that the administrator responsibly decided to gather further data before issuing the regulations that must be consistent with the Secretary's enforcement and administration of the surface mining act.[90]

A third factor bearing on the propriety of the administrator's exclusion of post-mining discharges is the extent to which this aspect of the industry is regulated without his direct intervention. Even in the absence of national standards, the administrator may issue permits on a case-by-case basis for post-mining discharges.[91] Moreover, since there are no national standards for post-mining point source discharges, effluent limitations certified by a state must be incorporated in a discharge permit.[92]

■ A suit to challenge the administrator's action on the basis of information not in the record, or for the imposition of a judicial deadline for the promulgation of post-mining regulations, would more appropriately be brought in a district court where matters not disclosed by the administrative

84. § 304(b)(1)(B) of the water pollution control act [33 U.S.C. § 1314(b)(1)(B)]; see FMC Corp. v. Train, 539 F.2d 973, 978–79 (4th Cir. 1976).

85. § 702(a)(3) of the surface mining act [30 U.S.C. § 1292(a)(3)].

86. 33 U.S.C. §§ 1311, 1314.

87. § 702(c) of the surface mining act [30 U.S.C. § 1292(c)].

88. § 201(c)(12) of the surface mining act [30 U.S.C. § 1211(c)(12)].

89. Id.

90. After the administrator issued the regulations applicable to active coal mines, the Secretary of the Interior promulgated interim final regulations to implement the surface mining act. See 30 C.F.R. Part 77 (1977). The administrator concurred in these regulations. 42 Fed. Reg. 62639 (Dec. 13, 1977). The regulations are presently under review. In re Surface Mining Regulation Litigation, 456 F.Supp. 1301, 11 E.R.C. 2078 (D.D.C.1978), appeal docketed, No. 78–2190 (D.C.Cir., Nov. 20, 1978); see also In re Surface Mining Regulation Litigation, 452 F.Supp. 327 (D.D.C.1978), aff'd mem., No. 78–1406 (D.C.Cir., May 25, 1978).

91. § 402(a)(1) [33 U.S.C. § 1342(a)(1)].

92. See §§ 301(b)(1)(C), 401, 510 [33 U.S.C. §§ 1311(b)(1)(C), 1341, 1370]; United States Steel Corp. v. Train, 556 F.2d 822, 835 (7th Cir. 1977).

record could be offered in evidence.[93] We hold only, on the record presented in these petitions for review, that the final regulations are not invalidated by the absence of provisions dealing with post-mining discharges.

## VIII. Catastrophic Rainfall Exemption

The citizen environmental petitioners and Pennsylvania challenge a provision, contained in §§ 434.22(c), 434.32(b), and 434.42(b) of the regulations, which is intended to allow overflow of untreated water from pollution control facilities in extraordinary circumstances. At the time these cases were briefed and argued, the regulations provided as follows:

> Any untreated overflow, increase in volume of a point source discharge, or discharge from a bypass system from facilities designed, constructed, and maintained to contain or treat the discharges from the facilities and areas covered by this subpart which would result from a 10-year 24-hour precipitation event, shall not be subject to the limitations set forth in paragraph (a) of this section.

This means that after a storm or other natural event that forces an overflow from a facility designed, constructed, and maintained to contain a 10-year 24-hour precipitation event,[94] the overflow will be permitted.[95] The record discloses that this provision is similar in many respects to safety standards previously promulgated by the Department of the Interior for water impoundment facilities at existing coal mines.[96]

The petitioners do not dispute the necessity for a catastrophic rainfall exemption, nor do they question a criterion of the heaviest 24-hour precipitation that can be expected to fall in a decade. Their principal complaint is that the administrator arbitrarily and capriciously based the exemption on the design, construction, and maintenance of the pollution control facilities rather than on the magnitude of actual precipitation. They prefer the regulation to specify that the exemption will apply only when the 10-year 24-hour rainfall actually occurs. They point out that in the catastrophic rainfall regulations applicable to other industries, the agency has used the criterion of actual performance, rather than design, construction, and maintenance.[97]

After oral argument of these cases, the administrator promulgated final regulations clarifying 40 C.F.R. §§ 434.22(c), 434.32(b), and 434.42(b). These provisions now expressly allow only discharges from properly

---

**93.** Section 505 [33 U.S.C. § 1365] allows any citizen, after giving the administrator sixty days' notice, to "commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." The same provision gives the district courts original jurisdiction over such suits, without regard to the amount in controversy or the citizenship of the parties. *See, e. g., Central Hudson Gas & Electric Corp. v. EPA,* 587 F.2d 549, 555–57 (2d Cir. 1978); *Environmental Defense Fund v. EPA,* 194 U.S.App.D.C. 143, 598 F.2d 62 (Nov. 3, 1978); *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 318–323, 510 F.2d 692, 698–703 (1975); *cf.* Currie Judicial Review under Federal Pollution Laws, 62 Iowa L.Rev. 1221, 1249–50 (1977).

**94.** "10-year 24-hour precipitation event" is an engineering term. It is a rainfall figure, taken from National Weather Service charts for the relevant geographic area, which indicates the heaviest 24-hour precipitation that can be expected to fall in a decade. 40 C.F.R. § 434.11(h) (1977). The possible use of this criterion as a basis for an overflow exemption was recognized during legislative debate on the Act. Senate Committee on Public Works, A Legislative History of the Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. 1298 (1973).

**95.** EPA summary of final regulations, 42 Fed. Reg. 21381 (April 26, 1977).

**96.** *See* Mandatory Safety Standards, Surface Coal Mines and Surface Work Areas of Underground Coal Mines, 30 C.F.R. 77.216 through 77.216–5 (1977) (promulgated by the Mine Enforcement and Safety Administration). The administrator took note of these regulations. 42 Fed.Reg. 21381–21382 (April 26, 1977).

**97.** *See, e. g.,* 40 C.F.R. §§ 415.22(b) (aluminum sulfate production) and 421.42(b) (primary copper smelting) (1977). These regulations allow an exemption for the 10-year 24-hour event only "when such event occurs."

designed and constructed facilities that "result[ ] from a 10 year/24 hour or larger precipitation event or from a snow melt of equivalent volume." [98]

■ We consider the law in effect at the time we render our decision. *See Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 281–83, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). EPA's change in the language of the exemption disposes of the criticism of Pennsylvania and the environmental petitioners.

The lack of provisions specifying the details of necessary design, construction, and maintenance does not invalidate the regulations. In all of the regulations under review, the administrator has avoided dictating engineering specifications. Instead, he has properly concentrated on prescribing limitations on the amount of pollutants that may be discharged regardless of the construction or treatment techniques that are employed. Using the 10-year 24-hour engineering standard without detailed specifications for impoundment facilities is consistent with this approach.[99]

The petitions to set aside the regulations are denied with the exception of the regulations dealing with variances, which are remanded to the agency for reconsideration.

---

**98.** 40 C.F.R. §§ 434.25(b), 434.35(b), 434.45(b), *promulgated in* 44 Fed.Reg. 2590 (Jan. 12, 1979).

**99.** Other regulatory agencies use this method of stating design storm criteria. These agencies include the Soil Conservation Service, the United States Bureau of Reclamation, the American Society of Civil Engineers, and the regulatory agencies of several states. *See* United States Department of the Interior, Mining Enforcement and Safety Administration, Engineering and Design Manual for Coal Refuse Disposal Facilities, page 6.57 n.1 and sources cited (1975).