**SIERRA CLUB, Plaintiff-Appellant,**

v.

**ABSTON CONSTRUCTION CO., INC., et al., Defendants-Appellees,**

**State of Alabama ex rel., Intervenor-Appellant.**

**No. 77–2530.**

United States Court of Appeals, Fifth Circuit.

June 23, 1980.

Edward Still, Birmingham, Ala., Ralph I. Knowles, University, Ala., John D. Hoffman, San Francisco, Cal., for Sierra Club.

William J. Baxley, Atty. Gen., State of Alabama, James R. Cooper, Jr., Asst. Atty. Gen., H. H. Caddell, Asst. Atty. Gen., Montgomery, Ala., for State of Alabama.

John Philip Williams, Jacksboro, Tenn., for Save Our Cumberland Mountains, Inc.

Michael A. McCord, Atty., Sanford Sagalkin, Edmund B. Clark, Dept. of Justice, Washington, D. C., for United States.

John E. Grenier, Birmingham, Ala., for Mitchell-Neely.

Lloyd S. Guerci, Dept. of Justice, Alan W. Eckert, Deputy Assoc. Gen. Counsel, Environmental Protection Agency, Washington, D. C., for amicus curiae.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

RONEY, Circuit Judge:

In this suit to enforce portions of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C.A. §§ 1251–65, 1281–93a, 1311–28, 1341–45, 1361–76, against coal strip miners, the issue is whether pollution carried in various ways into a creek from defendant coal miners' strip mines is "point source" pollution controlled by the Act.

Sediment basin overflow and the erosion of piles of discarded material resulted in rainwater carrying pollutants into a navigable body of water. Since there was no direct action of the mine operators in pumping or draining water into the waterway, the district court by summary judgment determined there was no violation of the Act because there was no "point source" of the pollution. Deciding the district court interpreted too narrowly the statutory definition of the prohibited "point source" of pollution, and that there remain genuine issues of material fact, we reverse.

Defendants Abston Construction Co., Mitchell & Neely, Inc., Kellerman Mining Co. and The Drummond Co. [hereinafter miners] operate coal mines near Daniel Creek, a tributary of the Black Warrior River, in Tuscaloosa County, Alabama. They each employ the strip mining technique, whereby rock material above the coal—the overburden—is removed, thereby exposing the coal that is close to the land surface. When the overburden is removed, it is pushed aside, and forms "spoil piles." During the mining operations, and thereafter if the land is not reclaimed by replacing the overburden, the spoil piles are highly erodible. Rainwater runoff or water draining from within the mined pit at times carried the material to adjacent streams, causing siltation and acid deposits. In an effort to halt runoff, the miners here occasionally constructed "sediment basins," which were designed to catch the runoff before it reached the creek. Their efforts were not always successful. Rainfall some-

times caused the basins to overflow, again depositing silt and acid materials into Daniel Creek.

Plaintiff Sierra Club brought a "citizen suit" under the Federal Water Pollution Control Act Amendments of 1972 (the Act), Claiming defendants' activities were proscribed "point sources" of pollution. 33 U.S.C.A. §§ 1362(14), 1365(a)(1)(A), (f). The State of Alabama through its attorney general was allowed to intervene with similar claims. On appeal, *amicus curiae* briefs have been received from the United States and Save Our Cumberland Mountains, Inc.

The parties do not dispute the ultimate fact that these pollutants appeared in the creek due to excess rainfall. Nor is there any disagreement the activities would be prohibited if the pollutants had been pumped directly into the waterways. The parties differ only on the legal responsibility of the miners for controlling the runoff and the legal effect of their efforts to control the runoff.

Plaintiff may prevail in its citizen suit only if the miners have violated some effluent limitations under the Act. 33 U.S.C.A. § 1365(a)(1)(A). Those limitations, in turn, apply only to "point sources" of pollution, as defined in the Act.

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C.A. § 1362(14). Nonpoint sources, on the other hand, are not due to be controlled. *See* S.Rep.No.92–414, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3744.

Thus, the issue is whether defendants' activities amounted to the creation of point sources of pollution. The district court ruled they did not. On the facts before it, the district court found the pollution had not resulted "from any affirmative act of discharge by the defendants." Instead, any water and other materials that were depos-

ited in Daniel Creek were carried by natural forces, mostly erosion caused by rainwater runoff, even though such erosion was "facilitated by the acts of defendants of creating pits and spoil banks in the course of their mining operations."

A preliminary question here is whether the Act may be applied to mining activities at all. The district court, although holding the miners here did not create point sources of pollution, conceded, correctly, we think, that "some strip mine operations may involve the discharge of pollutants in ways which would trigger application of the Act's enforcement provisions."

The 1972 legislation was designed to eliminate "discharge of pollutants into the navigable waters" of the United States by 1985. 33 U.S.C.A. § 1251(a)(1). Under this mandate the Environmental Protection Agency was directed to promulgate regulations governing point source discharges. *See Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692 (D.C.Cir.1975); 33 U.S.C.A. §§ 1251, 1314(b). The miners argue that Congress, in section 304(e)(2)(B) of the Act, 33 U.S.C.A. § 1314(f)(2)(B), intended that mining activities not be subject to the Act's effluent limitations, but that the Environmental Protection Agency only study and propose methods of controlling pollution resulting from mining. The Government points out, however, that an amendment, proposed in the House of Representatives to provide a regulatory program specifically covering coal miners, was withdrawn because it appeared to be duplicative. *See* Environmental Policy Division, Congressional Research Service, Library of Congress, *Legislative History of the Water Pollution Control Act Amendments of 1972*, 530–35 (Comm. Print, Senate Committee on Public Works, 93d Cong., 1st Sess. 1973). The EPA has been held to be precluded from exempting from the Act's permit requirements two other categories of pollution originally designated for further study, agricultural and silvicultural activities. *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1377 (D.C.Cir.1977).

■ The district court correctly concluded that mining activities, although embracing at times nonpoint sources of pollution that were intended only to be studied by the EPA, may also implicate point sources of pollution, expressly covered by the Act's effluent limitations. *See generally United States v. Earth Sciences, Inc.*, 599 F.2d 368, 372–73 (10th Cir. 1979).

As to whether the activities here fall under the definition of point sources of pollution, three positions are asserted: plaintiff's, defendants', and a middle ground presented by the Government. We adopt the Government's approach.

Plaintiff would merely require a showing of the original sources of the pollution to find a statutory point source, regardless of how the pollutant found its way from that original source to the waterway. According to this argument, the broad drainage of rainwater carrying oily pollutants from a road paralleling a waterway, or animal pollutants from a grazing field contiguous to the waterway, would violate the Act. Whether or not the law should prohibit such pollution, this Act does not. The focus of this Act is on the "discernible, confined and discrete" conveyance of the pollutant, which would exclude natural rainfall drainage over a broad area.

Defendants, on the other hand, would exclude from the point source definition any discharge of pollutants into the waterway through ditches and gullies created by natural erosion and rainfall, even though the pollutant and the base material upon which the erosion could take place to make gullies was created by the mine operation, and even though the miners' efforts may have permitted the rainwater to flow more easily into a natural ditch leading to the waterway. This interpretation, essentially adopted by the district court, too narrowly restricts the proscription of the Act because it fails to consider fully the effect the miners' activity has on the "natural" drainage.

The United States, which participated in the case as *amicus curiae*, takes a middle ground: surface runoff collected or channeled by the operator constitutes a point

source discharge. Simple erosion over the material surface, resulting in the discharge of water and other materials into navigable waters, does not constitute a point source discharge, absent some effort to change the surface, to direct the waterflow or otherwise impede its progress. Examples of point source pollution in the present case, according to the Government, are the collection, and subsequent percolation, of surface waters in the pits themselves. Sediment basins dug by the miners and designed to collect sediment are likewise point sources under the Government's view even though the materials were carried away from the basins by gravity flow of rainwater.

We agree with the Government's argument. Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials. A point source of pollution may also be present where miners design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials. The ultimate question is whether pollutants were discharged from "discernible, confined, and discrete conveyance[s]" either by gravitational or nongravitational means. Nothing in the Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water. Conveyances of pollution formed either as a result of natural erosion or by material means, and which constitute a component of a mine drainage system, may fit the statutory definition and thereby subject the operators to liability under the Act.

The cases which were not decided until after the district court decision tend to support the view adopted here. In *Consolidation Coal Co. v. Costle*, 604 F.2d 239 (4th Cir. 1979), *cert. granted sub nom. Environmental Protection Agency v. National Crushed Stone Association*, —— U.S. ——, 100 S.Ct. 1011, 62 L.Ed.2d 750 (1980), 17 coal producers, among others, challenged regulations promulgated by the Environmental Protection Agency under the Act, claiming the regulations could have been interpreted to apply to surface runoff that does not fit within the point source statutory definition. Specifically, the regulations covered "discharges which are pumped, siphoned or drained from coal storage." 40 C.F.R. § 434.20 (1979); 604 F.2d at 250. The Fourth Circuit, noting only that the definition of point source "excludes unchanneled and uncollected surface waters," *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976), refused to overturn the regulations on their face, delaying consideration of the issue "in the absence of a full factual background." 604 F.2d at 249–50.

*United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979), involved application of the Act to a gold leaching process. There, an unusually rapid melting of snow caused primary and reserve pumps, designed to catch excess runoff and gold leachate, to overflow, resulting in the discharge of a pollutant into a creek. The United States brought an enforcement action under the Act, charging the mine had discharged a pollutant into navigable waters from a point source. After disposing of defendant's argument that mining is strictly a nonpoint source of pollution, the Tenth Circuit considered whether overflows from Earth Science's operations were point sources, and whether there had actually been a discharge under the Act. Earth Sciences argued the reference to "conveyance" in the point source definition, 33 U.S.C.A. § 1362(14), requires a ditch or pipe, "or some instrument intended to be used as a conduit." In rejecting defendant's approach, the court found,

> The undisputed facts demonstrate the combination of sumps, ditches, hoses and pumps is a circulating or drainage system to serve this mining operation.

.    .    .    .    .

Despite the large capacity (168,000 gallons for the reserve sump) we view this operation as a closed circulating system to serve the gold extraction process with no discharge. When it fails because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, whether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source. Although the source of the excess liquid is rainfall or snow melt, this is not the kind of general runoff considered to be from nonpoint sources under the [Act].

599 F.2d at 374.

The court also rejected defendant's contention that the Act covers only the intentional discharge of pollutants into navigable waters. Section 1362(12), the court noted, "defines discharge of pollutants as '*any* addition of *any* pollutant to navigable waters from any point source.'" *Id.* (court's emphasis). Thus, the court held that even unintentional discharges of pollutants from a mine system designed to catch runoff during periods of excess melting met the statutory definition of a point source.

■ Under the view of the law adopted here, there remain genuine issues of material fact. Viewed in a light most favorable to Sierra Club, the party opposing the motion for summary judgment, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the affidavits and depositions considered by the district court indicate that significant amounts of dirt, sand and other solid particles were transported from the spoil banks by rainwater to Daniel Creek. Earl Bailey, a Sierra Club vice president and a professor at the University of Alabama, testified by affidavit that he observed

> gullies and ditches running down the sides of steep spoil piles created by Abston Construction Company. The sedimentation and pollutants are carried through these discernible, confined and discrete conveyances to Daniel Creek.

Bailey's observations of ditches and gullies were confirmed by Philip Abston, president of the Abston Construction Co., who noted that the gullies would carry water and sediment toward the creek.

Dwight Hicks, who served as defendant Drummond Co.'s manager of reclamation and environmental control, testified that in some areas, drainage basins were constructed to catch sediment flowing down the outer edges of the spoil piles. Hicks noted the basins were constructed along a "drainage course," by placing earthen material on the lower end of a slope. He described construction of the "B–21" dam as follows:

> [T]hat's just the general type dam section that is put into the small drainage course with a standpipe and an emergency spillway.
>
> The material is either pushed in or hauled in after residual vegetation is removed. It is compacted and a standpipe, the primary means of outflow, is installed, and then an emergency spillway is built around the side of it.

Hicks added that in the event of a measurable amount of precipitation, water and small amounts of sediment would drain through the sediment basin outflow.

An affidavit filed by Garry Drummond, president of defendant Drummond Co. in support of its motion for summary judgment, contains starkly contrasting language.

> Neither company has engaged in the operation of any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation or vessel or other floating craft from which pollutants are or may be discharged.
>
> Neither company has discharged any pollutant including surface water runoff into Daniel Creek or the tributaries of the same during the period of operation as noted hereinabove.

On some occasions, according to the various affidavits and depositions, severe rainfall caused some of the sediment basins to overflow, spilling out their contents, and

again those materials flowed toward the creek. Rainwater trapped in the mine pits themselves also eventually percolated through the banks and flowed toward the creek, carrying with it acid and chemicals from the pit.

Thus, additional findings are necessary to determine the precise nature of spoil basins constructed by defendant Drummond. In light of Hicks's statement that a "standpipe and an emergency spillway" were constructed to guard against spoil basin overflow, we note that a "pipe" from which pollutants are discharged may be a point source of pollution. 33 U.S.C.A. § 1362(14). This design could likewise fit under the *Earth Sciences* finding that "the escape of liquid from [a] confined system is from a point source," 599 F.2d at 374, since the affidavits and depositions suggest that water and other materials escaped from the mines and sediment basins, eventually finding their way to Daniel Creek. Furthermore, factual findings are lacking insofar as the sediment basins and other devices may be characterized as encompassing "container[s], . . . from which pollutants are or may be discharged." 33 U.S.C.A. § 1362(14).

While defendants have denied taking any direct action resulting in the discharge of pollutants into Daniel Creek, Bailey described "[m]ine spoil pushed into Daniel Creek so as to block the waterway." Even under the district court's requirement that the alleged polluters take some "affirmative act" before a finding of point source pollution is warranted, the activity described by Bailey suggests a discharge of pollutants into the creek. In considering this issue, the district court should deem controlling § 502(12) of the Act, which, as pointed out by the *Earth Sciences* court, defines discharge as "any addition of any pollutant to navigable waters . . . ." 33 U.S.C.A. § 1362(12).

■ Although the point source definition "excludes unchanneled and uncollected surface waters," *Consolidation Coal Co.*, 604 F.2d at 249; *Appalachian Power*, 545 F.2d at 1373, surface runoff from rainfall, when collected or channeled by coal miners in connection with mining activities, constitutes point source pollution.

The district court's decision is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.