**SHANTY TOWN ASSOCIATES LIMITED PARTNERSHIP,**
Plaintiff–Appellant,

v.

**ENVIRONMENTAL PROTECTION AGENCY; Worcester County Sanitary Commission; State of Maryland, Department of the Environment,** Defendants–Appellees,

Natural Resources Defense Council; Chesapeake Bay Foundation, Inc.; Environmental Policy Institute; Committee to Preserve Assateague Island, Inc.; National Parks & Conservation Association; Worcester Environmental Trust; Worcester Environmental Protection Fund, Inc.; Maryland Conservation Council; Maryland Wetlands Committee; Coalition of O.C. Civic Organizations; Maryland Ornithological Society, Inc.; Maryland Wildlands Committee; Audubon Naturalist Society of the Central Atlantic States, Inc., Amici Curiae,

James M. Seif, individually and as Regional Administrator of the U.S. Environmental Protection Agency; William M. Eichbaum, individually and as Assistant Secretary, Department of Health and Mental Hygiene, Richard B. Sellars, Jr., individually and as Director, Water Management Administration; Worcester County Sanitary District, Defendants.

No. 87–1091.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1988.

Decided April 4, 1988.

Raymond Stevens Smethurst, Jr. (Barbara R. Trader; Adkins, Potts & Smethurst, Salisbury, Md., on brief), for plaintiff-appellant.

Laura Emily Frossard, Dept. of Justice, Washington, D.C., (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Md., Roger J. Marzulla, Acting Asst. Atty. Gen., Washington, D.C., Richard M. Hall, Asst. Atty. Gen., Baltimore, Md., Lydia Duff, Maryland Dept. of the Environment, Dirk D. Snel, Dept. of Justice, Francis S. Blake, Gen. Counsel, Washington, D.C., Stephen G. Pressman, U.S.E.P.A., Atlanta, Ga., on brief), for defendants-appellees.

(Timothy J. Lindon, Arnold & Porter, Washington, D.C., on brief), for amici curiae Natural Resources Defense Council, Inc., Chesapeake Bay Foundation, Inc., Environmental Policy Institute, Committee to Preserve Assateague Island, Inc., National Parks and Conservation Ass'n, Worcester Environmental Trust, Worcester Environmental Protection Fund, Inc., Maryland Conservation Council, Maryland Wetlands Committee, Coalition of O.C. Civic Associations, Maryland Ornithological Soc., Inc., Maryland Wildlands Committee and Audubon Naturalist Soc. of the Central Atlantic States, Inc.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

This action by a developer challenges the Environmental Protection Agency's imposition of certain restrictive conditions upon funds it granted to a municipality for the construction of a sewage collection system under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1251–1376. The district court rejected the challenge. Because we conclude that EPA had statutory authority to impose the grant conditions in question, and that it did not act arbitrarily and capriciously in so doing, we affirm.

I

Before 1972, the FWPCA consisted primarily of a system of state-developed ambient water quality standards.[1] Under this regime, the focus was on the quality of the receiving waters, rather than the nature of the effluent being discharged into them; individual dischargers could be required to reduce their pollution output only if it caused the quality of the receiving body of water to fall below the applicable standard. But this approach proved ineffective in combatting water pollution, due to difficulty in tracing violations of standards to particular polluters, a cumbersome enforcement process, and the "awkwardly shared" federal and state responsibility for promulgating the standards. *See generally EPA v. California Water Resources Control Bd.*, 426 U.S. 200, 202, 203, 96 S.Ct. 2022, 2023, 2024, 48 L.Ed.2d 578 (1976).

In the early 1970s, increasing public concern about the state of the nation's waters led Congress to undertake a major overhaul of the FWPCA. The Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816, sharply increased the federal role in regulating water quality, establishing a comprehensive federal program designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The 1972 amendments declared specific "national goals" of making the nation's waters fishable and swimmable by 1983, and totally eliminating the discharge of pollutants into them by 1985. *Id.* § 1251(a)(1)–(2).

Responsibility for the implementation of these ambitious goals was vested in the Environmental Protection Agency (EPA), which had been created in 1970. To assist EPA in this task, the 1972 amendments

---

1. The Act was first passed in 1948 and has been amended since numerous times. See annotation following 33 U.S.C. § 1251.

gave it two principal powers. First, Title III of the amended Act gave EPA the authority to develop and impose uniform federal restrictions on the discharge of pollutants into navigable interstate waters. *See id.* § 1311(b). These technology-based "effluent limitations" were to be enforced through the National Pollutant Discharge Elimination System (NPDES), which made it illegal to discharge pollutants from any "point source" [2] without a permit issued by EPA or a state whose permit program has been approved by EPA as meeting federal standards. *See id.* § 1311(a) (prohibiting discharge of pollutants except in compliance with a NPDES permit); *id.* § 1342(a) (authorizing EPA to issue NPDES permits for discharges that meet the applicable effluent limitations); *id.* § 1342(b) (authorizing EPA to transfer the authority to issue NPDES permits to a state whose permit program incorporates federal effluent limitations). Second, and more relevant for our purposes here, Title II of the amended Act gave EPA the authority to administer a massive federal spending program designed to assist state and local governments in their efforts to control water pollution. *Id.* §§ 1281–1299.

Section 201 of the Act gives EPA the general authority to make grants to state and local governments for the development and implementation of waste treatment management plans and practices which will achieve the Act's water quality goals. *Id.* § 1281(a). Section 201(g)(1) specifically authorizes it to make grants for the construction of publicly-owned wastewater treatment works. *Id.* § 1281(g)(1). As defined in the statute, a "treatment work" need not be a building or facility, but can be any device, system, or other method for treating, recycling, reclaiming, preventing, or reducing liquid municipal sewage and industrial waste, including storm water runoff. *Id.* § 1292(2)(A)–(B).

Grant funds are appropriated annually by Congress and then allocated by EPA to the states, which are responsible for determining the priority of proposed treatment works in accordance with certain federal guidelines. Local governments seeking grant funds must make application first to the state agency charged with administering the federal grant program; after that agency approves the project and determines its relative priority, it forwards the application to the EPA itself for final approval. *See generally* 40 C.F.R. Part 35, Subpart I (1987). EPA's approval is conditioned on a number of criteria, including requirements that the proposed facility be cost-effective according to federal standards, *see* 33 U.S.C. § 1284(a)(4); that its size and capacity be directly related to the needs it is designed to serve, *see id.* § 1284(a)(5); and that the applicant adopt a system of user fees, *see id.* § 1284(b). EPA's own regulations implementing the construction grant program authorize it to impose any additional conditions necessary to minimize the water pollution caused by the facility's construction. *See* 40 C.F.R. § 35.840(a) (1987).

## II

Plaintiff Shanty Town Associates Limited Partnership (Shanty Town) owns a lot in West Ocean City, Maryland, an unincorporated region of approximately 2300 acres in Worcester County, on the coast of Maryland. The Isle of Wight Bay borders the region on the north and east, Sinepuxent Bay and the Assateague Island National Seashore lie to the southeast, and to the west, across Herring Creek, is the mainland. Much of the region consists of environmentally sensitive lands—floodplains, wetlands, and prime agricultural lands—that are protected by federal, state, and local regulations. Approximately 60% of the developed property in West Ocean City

---

**2.** The Act defines a "point source" as:

any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, [or] rolling stock ... from which pollutants are or may be discharged.

33 U.S.C. § 1362(14). This definition excludes unchanneled and uncollected surface runoff, which is referred to as "nonpoint source" pollution. *See Appalachian Power Co. v. EPA,* 545 F.2d 1351, 1373 (4th Cir.1976).

lies within the 100–year floodplain.[3] The controversy in this case centers around further development of the floodplains area.

Because of its poor soil and high water table, the West Ocean City area has suffered for many years from water pollution caused by failing septic systems. This problem has significantly inhibited development in the area, and the Worcester County Sanitary Commission[4] has on several occasions considered installing a public sewage system to remedy it. In 1983, the Sanitary Commission decided to construct a system that would collect sewage and other wastewater from the West Ocean City area and carry it to the County's existing treatment plant in the adjacent community of Ocean City. To finance this project, the Sanitary Commission sought a Title II construction grant from EPA.

EPA determined that awarding funds for the project would be a "major federal action significantly affecting the quality of the human environment." It therefore analyzed the environmental effects of the proposed project in an Environmental Impact Statement (EIS), as it was required to do by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370.[5] The draft EIS concluded that the proposed system would induce considerable development in the floodplains, which would result in increased runoff of pollutants into the adjoining bays. But the draft EIS also determined that the proposed system was the only practicable way to eliminate the acute pollution problems caused by the failing septic systems; it therefore considered various ways to minimize the environmental harm the development induced by the system would cause. The draft EIS concluded that this could best be done by

imposing restrictions on the use of the federally-funded system which would make new development in the area less attractive.

After receiving and considering public comments, EPA issued the final EIS. The EIS concluded that EPA could not, consistent with applicable federal environmental laws, award funds for the construction of the proposed system unless West Ocean City agreed to abide by certain restrictions on its use. Specifically, EPA insisted that service from the federally-funded system be made available to property within the floodplain only to the extent necessary to serve developments in existence at the time of the grant, with a single exception: undeveloped lots platted for buildings prior to June 1, 1977 would be allowed one equivalent dwelling unit (EDU)'s[6] worth of service for buildings constructed after the date of the grant. No service from the system would be available for any other new developments in the floodplains area, and no service at all from the system would be available within the wetlands area. Property owners would remain free, however, to use other methods of wastewater disposal, including on-site septic systems, to service new developments, subject to state and local regulations.

The Sanitary Commission initially objected to the access restrictions. After considering alternative means of financing the project, however, it reluctantly agreed to accept the federal grant with its conditions. To assure fidelity to the access restrictions, EPA insisted that the Sanitary Commission enter into a consent order with the Maryland Department of Health (the Department of Health), the state agency respon-

---

**3.** The "100–year floodplain" is the portion of the low-lying land adjoining inland and coastal waters that is, on average, likely to be flooded every 100 years (i.e., has a one percent chance of flooding in any given year).

**4.** The three-member Sanitary Commission governs the Worcester County Sanitary District, a body corporate formed by the Worcester County Commissioners for the purpose of providing the county's residents with water and sewer service.

**5.** Section 102 of the NEPA requires any federal agency considering a "major Federal action sig-

nificantly affecting the quality of the human environment" to prepare an Environmental Impact Statement (EIS) that identifies the environmental consequences of the proposed action and recommends ways to minimize those which are adverse. *Id.* § 4332(2)(C).

**6.** An EDU is approximately 280 gallons of wastewater per day, which is the amount normally produced by a single-family residential dwelling.

sible for administering the FWPCA construction grant program in the State of Maryland. In the consent order, the Sanitary Commission agreed to limit use of the federally-funded system in the manner suggested in the draft EIS. The Sanitary Commission also agreed to establish a permit system for obtaining service from the new facility. Under this permit system, initial application would be to the Worcester County Health Officer, with a right of appeal to the Director of the Water Management Administration of the Department of Health, and with further review pursuant to the Maryland Administrative Procedure Act.

Shanty Town's West Ocean City tract is one of 4.5 acres, located in the 100-year floodplain, within the area to which the grant conditions apply. It currently contains a fair-sized shopping center, which is entitled to service from the federally-funded sewage collection system, since it was in existence at the time the EPA grant was made. At present, this property discharges approximately 5,200 gallons of wastewater per day.

Shanty Town wishes to develop its West Ocean City property further by constructing a 100-unit hotel and 20,000 square feet of additional retail space, which it estimates will increase its wastewater output to approximately 30,000 gallons per day. In March 1986, Shanty Town applied to the Worcester County Health Office for a permit allowing it to increase its wastewater discharge to 30,000 gallons per day. The application was denied, and Shanty Town appealed to the Director of the Waste Management Administration, who affirmed the denial. Shanty Town then appealed to the Department of Health, which also sustained the denial of additional service. Further administrative appeal is now pending within the state system.

Shanty Town then instituted this action in federal district court against EPA and its Regional Administrator (federal defendants), the State Department of Health and two of its officials (state defendants), and the local Sanitary District and Commission (local defendants), seeking declaratory and injunctive relief against the grant conditions and the consent order implementing them. Shanty Town asked the court to set aside the grant conditions on the grounds that EPA lacked statutory authority to impose them or, alternatively, that even if EPA had such authority, its exercise of that authority in this particular case was arbitrary and capricious. Shanty Town also alleged that the grant conditions restricting the use of the federally-funded sewage collection facility violated its substantive due process rights.

The defendants moved to dismiss for lack of subject matter jurisdiction or, in the alternative, failure to state a claim. The district court held first that it had subject matter jurisdiction under the general federal question statute, 28 U.S.C. § 1331, because the action was one "arising under" the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.[7] Treating the 12(b)(6) motion as a motion for summary judgment, the district court first dismissed the state and local defendants,[8] then held that the

7. Though Shanty Town's complaint did not identify the source of its cause of action, the district court properly treated the action as one brought under § 10 of the APA, 5 U.S.C. § 702, because it sought judicial review of an action by a federal administrative agency. While § 10 does not itself confer federal subject matter jurisdiction over such actions, jurisdiction exists under the general federal question statute. *Califano v. Sanders*, 430 U.S. 99, 104-07, 97 S.Ct. 980, 983-85, 51 L.Ed.2d 192 (1977).

8. The district court dismissed the claims against these defendants on the basis that they had been joined "solely for the purpose of obtaining complete relief in the event the EPA conditional grant was struck down" and that there were "no independent claims against them." This basis for dismissal is somewhat obscure and may in some respects be questionable; but even if in part erroneous, the error is harmless. The State Department of Health could, and should, properly have been dismissed as immune to suit under the eleventh amendment. This ground did not, however, provide an alternative basis for dismissal of the individual state defendants who were sued only for prospective relief, nor the local defendants. As to these jurisdictionally exposed defendants, it is arguable that—contrary to the district court's view—viable federal claims were stated for action under color of state law which in concert with that of the federal defendants deprived plaintiff of federally secured rights. Without deciding whether

federal defendants were entitled to summary judgment on two alternative grounds. First, the court held that Shanty Town lacked standing to challenge the grant conditions. Second, the district court held that even if Shanty Town did have standing, its arguments failed on the merits.

Shanty Town then took this appeal, which challenges the grant conditions as beyond EPA's authority or arbitrary and capricious, but abandons the substantive due process claim. Because the district court properly dismissed the state and local defendants, *see* note 8 *supra,* we consider only the claims against the federal defendants.

### III

Our jurisdiction depends on the threshold question of whether Shanty Town, who was not the actual recipient of the West Ocean City grant, has standing to challenge the federal conditions imposed upon the grant recipients. The district court concluded that it did not. We disagree.

Standing to seek judicial review of agency action requires that a plaintiff (1) have suffered an "injury in fact" as a result of the challenged action, and (2) assert an interest that is "arguably within the zone of interests" that Congress intended the relevant statute to protect or regulate. *See Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). The "injury in fact" requirement, which is necessary to insure that there is a "case or controversy" within the meaning of article III, requires a plaintiff to show not only that he has personally suffered a distinct and palpable injury, but also that there is a "fairly traceable" causal connection between that injury and the challenged action. *See Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629–30, 57 L.Ed.2d 595 (1978).

■ In this case, there is little doubt that the interest Shanty Town asserts—the right to hook up to a federally-funded wastewater treatment works—is arguably within the zone of interests that Congress intended EPA to take into account in exercising its grantmaking authority under Title II of the FWPCA. Nor is there any doubt that the injury alleged by Shanty Town—revenues lost as a result of its inability to obtain sewer service for its proposed development—is sufficiently distinct and palpable to satisfy article III. *See Association of Data Processing Service Orgs. v. Camp,* 397 U.S. at 152, 90 S.Ct. at 829.

■ The district court held, however, that Shanty Town had not shown the requisite causal connection between this alleged injury and EPA's imposition of the challenged conditions on the West Ocean City grant. The court reasoned that it was the local Sanitary Commission, rather than EPA, which had actually denied Shanty Town the requested sewer service, and that there was no evidence that the Commission would grant Shanty Town that service even if the grant conditions were struck down. In the district court's view, only the local Sanitary Commission itself, as the actual recipient of the EPA grant, had standing to challenge the conditions imposed upon it.

We disagree. It is true that it was the local Sanitary Commission, as the entity responsible for the day-to-day operation of the federally-funded system, that actually imposed the restrictions on service to Shanty Town's property. But we think it plain, from the record before us, that the Sanitary Commission would not have imposed those restrictions had it not been for EPA's insistence upon them. It is undisputed that the Sanitary Commission initially opposed the access restrictions, and that it agreed to adopt them only when it became apparent that it could not finance the system without assistance from EPA. Shanty Town presented affidavits from several members of the Sanitary Commission indicating that it would have approved Shanty

Town's request for additional service had it not been for the challenged grant conditions. On this record, we conclude that Shanty Town has established a sufficient causal relationship between its alleged injury and EPA's imposition of the challenged grant conditions to enable it to maintain this action. *See United States v. SCRAP*, 412 U.S. 669, 686–90, 93 S.Ct. 2405, 2415–17, 37 L.Ed.2d 254 (1973) (environmental groups had standing to challenge ICC's approval of freight rate increase because they alleged it would harm their enjoyment of the environment by discouraging the use of recycled goods).

## IV

We therefore turn to the merits of Shanty Town's appeal. EPA's actions with respect to the West Ocean City grant are subject to judicial review in accordance with the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq. Under the APA, a reviewing court may set aside agency action that it finds to be in excess of the agency's statutory jurisdiction or authority; without observance of procedures required by law; or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). Our review is therefore limited to three possible questions—the first statutory, the second procedural, and the third substantive. *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1024 (D.C.Cir.1978).

In this case, Shanty Town has not argued that EPA failed to follow proper procedures in imposing these grant conditions. The contentions are that EPA lacks authority under the FWPCA to limit access to sewage facilities, and, alternatively, that

even if the statute does give EPA such authority, the agency's exercise of that authority in this particular case was arbitrary and capricious. We take these arguments in turn.

### A

As to whether EPA has statutory authority to impose these grant conditions, EPA concedes that the FWPCA does not give it authority to regulate sewer service directly. But EPA argues that Title II of the FWPCA, which gives it authority to make grants to state and local governments for the construction of publicly-owned wastewater treatment facilities, also gives it the incidental authority to restrict the use of those facilities, where necessary to further the Act's water quality goals.[9] EPA's argument that these particular access restrictions are necessary to further the Act's water quality goals is based upon two related factual findings. First, that the availability of better sewer service in the West Ocean City area will lead to an explosion of development, which will lead in turn to increased "nonpoint source" pollution.[10] Second, that this increase in nonpoint source pollution could have a detrimental effect on the water quality of the adjoining bays, perhaps even to the point of offsetting any benefits that might be achieved by correcting the existing septic tank problem. In EPA's view, then, the challenged use restrictions, which would minimize the nonpoint source pollution caused by the new facility by limiting the amount of new development it can support, are necessary to insure that the West Ocean City grant is consistent with the FWPCA's water quality goals.

Shanty Town does not question EPA's general authority to attach conditions to Title II grant funds.[11] Instead, it chal-

9. EPA also contends that it was authorized to impose these grant conditions by Executive Order 11,988, which requires all federal agencies to avoid direct or indirect support of growth in the coastal floodplain, where there is a practicable alternative. *See* E.O. 11,988, § 2(a), 42 Fed. Reg. 26,951 (1977). We do not find it necessary to address this argument, because we find that

the FWCPA itself gave EPA the authority to impose these grant conditions.

10. Nonpoint source pollution is runoff from agriculture, silviculture, mining, construction, roads, urban development, and other diffuse sources.

11. The FWPCA itself contains no express provision authorizing EPA to attach conditions to

lenges these particular grant conditions on the ground that they disturb the delicate balance of federal and state power created by Congress in the FWPCA and two other federal environmental statutes, the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451 et. seq., and the National Flood Insurance Act (NFIA), 42 U.S.C. §§ 4001 et seq. The argument, in essence, is that the grant conditions conflict with Congress' deliberate decision, in those statutes, to allocate control over nonpoint source pollution and land use in the coastal floodplains area to the states.

### (1)

■ In considering Shanty Town's statutory argument, we start with the principle that the construction placed on a statute by the agency charged with administering it is entitled to considerable deference from the courts, and will ordinarily be upheld if it has a "reasonable basis in law." *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). So long as the agency's interpretation represents a reasonable accommodation of conflicting policies that were committed to its care by the statute, we are not at liberty to reject it merely because we might have reached a different conclusion if confronted with the issue in the first instance. *See Chevron*, 467 U.S. at 843–44 & n. 11, 104 S.Ct. at 2782–83 & n. 11; *United States Army Eng. Center v. FLRA*, 762 F.2d 409, 414 (4th Cir.1985). Congress charged EPA, in the FWPCA,

with developing special expertise in the control of water pollution, and with using that expertise to carry out the FWPCA's goal of improving water quality. As a result, EPA is entitled to special deference when it applies the general provisions of the FWPCA to the complexities of particular water pollution control problems. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).

On the other hand, we are not obliged to endorse every interpretation of the FWPCA advanced by EPA. Agency expertise notwithstanding, the courts remain the final authorities on issues of statutory construction, *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1042–43, 13 L.Ed.2d 904 (1965), and must not "stand aside and rubberstamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute," *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *see American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965) ("The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.").[12] Our task in review is therefore to determine whether, from the structure of the FWPCA and its legislative history, it is clear that EPA's interpretation of the statute is not one that Congress would have sanctioned. *See Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v.*

---

Title II grants. But EPA's implied authority to do so, where necessary to carry out the goals of the Act, cannot seriously be questioned. *See City of Columbia v. Costle*, 710 F.2d 1009 (4th Cir.1983) (assuming, without discussion, that EPA may impose conditions on Title II grant funds); *see also Consolidation Coal Co. v. Costle*, 604 F.2d 239, 243 (4th Cir.1979) (FWPCA is to be given the broadest possible reading consistent with the commerce clause, and all ambiguities as to the Administrator's powers under the Act are to be resolved in his favor), *rev'd on other grounds*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980).

**12.** We note, in this connection, that this case requires us not only to construe the FWPCA

itself, but also to consider an arguable conflict between that Act and two statutes that EPA does *not* administer, the CZMA and the NFIA. While we of course owe considerable deference to EPA's interpretation of the FWPCA, we are not required to defer to its interpretation of the CZMA and the NFIA, or to its resolution of any conflict between the FWPCA and those statutes. *See New Jersey Air National Guard v. FLRA*, 677 F.2d 276, 281–82 & n. 6 (3d Cir.1982); *see also Tsosie v. Califano*, 651 F.2d 719, 722 (10th Cir. 1981) (agency's interpretation of another agency's statutes and regulations not entitled to deference).

*Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560–61, 6 L.Ed.2d 908 (1961)). With these principles in mind, we turn to an analysis of the arguments raised by Shanty Town.

### (2)

▮ Shanty Town contends first that EPA's imposition of grant conditions designed to protect water quality from non-point source pollution conflicts with the FWPCA's allocation of control over non-point source pollution to the states. In support of this argument, Shanty Town notes that while the FWPCA provides for direct federal regulation of point source pollution through the National Pollutant Discharge Permit system, it contains no such provision regarding nonpoint source pollution. In addition, the Act specifically states that

> [i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use ... of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b). Shanty Town argues that these provisions evince a congressional intent to prevent EPA from taking any action designed to reduce nonpoint source pollution.

We disagree. It is true that the FWCPA contains no mechanism for *direct* federal regulation of nonpoint source pollution. But the Act's legislative history makes clear that this omission was due not to Congress' concern for state autonomy, but simply to its recognition that the control of nonpoint source pollution was so dependent on such site-specific factors as topography, soil structure, rainfall, vegetation, and land use that its uniform federal regulation was virtually impossible. *See* 117 Cong. Rec. 38825 (1971) (Sen. Muskie); S.Rep. No. 414, 92d Cong., 1st Sess. 39–40 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668 *reprinted in* 2 Senate Comm. on Public Works, 93d Cong., 1st Sess. *A Legislative History of the Water Pollution Control Act Amendment of 1972,* at 1457–58

(Comm. Print 1973); Environmental Law Instit., *Federal Environmental Law* 769–70 (E. Dolgin & T. Guilbert eds. 1974); *see also United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979) ("It is clear from the legislative history [that] Congress would have regulated so-called nonpoint sources if a workable method could have been derived."). Because of these practical difficulties, Congress was forced to shift primary control for the control of nonpoint source pollution to the states. But it did so by a device which allowed the federal government to retain substantial control over the regulation of nonpoint source pollution—the mandatory planning process set forth in § 208 of the FWCPA.

Section 208(a) requires the governor of each state to identify, in accordance with federal guidelines, all areas within his state that have substantial water quality control problems, and to designate a regional planning agency to formulate and operate a comprehensive waste treatment management plan for each such area. 33 U.S.C. § 1288(a)(2). Section 208(b)(2) requires each plan to contain, among other things, procedures for the identification and control of the area's major sources of nonpoint source pollution—including runoff from agriculture, silviculture, mining, construction, and saltwater intrusion. *Id.* § 1288(b)(2). To assist the states in carrying out this task, § 304(f) directs EPA to issue guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and processes, procedures, and methods designed to control pollution resulting therefrom. *Id.* § 1314(f). Each plan must be submitted to EPA for approval. *Id.* § 1288(b)(3). The Act provides no *direct* mechanism by which EPA can force the states to adopt adequate nonpoint source pollution control programs. Instead, Congress anticipated that EPA would use the threat and promise of federal financial assistance to accomplish this task. Section 208(f) authorizes EPA to make grants to the states to help defray the costs of developing and administering the mandatory § 208 plans, *id.* § 1288(f), and § 201(g)(1) authorizes EPA to make

grants for the construction of specific facilities—like storm sewer systems—that § 208 plans identify as potential methods of controlling nonpoint source pollution, *id.* § 1281(g). By threatening to withhold these grant funds, EPA is able to influence the states to adopt nonpoint source pollution control programs that will accomplish the Act's water quality goals. *Cf. Natural Resources Defense Council, Inc. v. Costle,* 564 F.2d 573 (D.C.Cir.1977) (approving withholding of grant funds as means of assuring compliance with the § 208 process).

In our view, the structure and legislative history of the FWPCA thus provide no support for Shanty Town's contention that Congress intended EPA to play no role in controlling nonpoint source pollution. To the contrary, the FWPCA sets up a program of "cooperative federalism" in which the state and federal governments work closely together to control nonpoint source pollution. The basic goals of this program are set by Congress—to restore and maintain the chemical, physical, and biological integrity of the nation's waters and make them fishable and swimmable again. The states are, for practical reasons discussed above, charged with much of the burden of developing and carrying out measures which will achieve these goals. But in so doing, they serve merely as agents for the implementation of federal water pollution control policy; it is the federal government, not the individual states, that shapes and directs the regulatory policy.

Nor do we find anything in the language or legislative history of the FWPCA that indicates a congressional intent specifically to preclude EPA from imposing conditions on Title II construction grants that are designed to reduce the amount of nonpoint source pollution generated, either directly or indirectly, by the facilities those grants fund. The stated purpose of the grant program is to encourage the construction of wastewater treatment facilities that will carry out the goals of the Act, which are, as indicated, to protect water quality from both point and nonpoint source pollution. To hold that EPA may not impose grant conditions designed to minimize the nonpoint source pollution these facilities cause, so that their beneficial effect on water quality may be maximized, would be to confine EPA's discretion in administering the grant program in a way we do not think Congress intended. EPA's mandate under the grant program is, after all, to provide funding for treatment works that will *improve* the quality of the nation's waters. We do not think it unreasonable for EPA to interpret this broad grant of authority as permitting it to impose grant conditions that directly further this goal by minimizing the amount of nonpoint source pollution caused by a federally-funded sewage treatment facility. *See Consolidation Coal Co. v. Costle,* 604 F.2d 239, 243 (4th Cir.1979) (FWCPA is to be given the broadest possible reading consistent with the commerce clause, and all ambiguities as to EPA's authority under the Act are to be resolved in its favor), *rev'd on other grounds,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 163 (1980).

We therefore conclude that EPA did not exceed its authority under the FWPCA in attaching conditions to the West Ocean City grant that were designed to reduce nonpoint source pollution.[13]

(3)

Shanty Town also contends that EPA's imposition of grant conditions that restrict access to federally-funded sewage facilities located in the coastal floodplains region conflicts with the balance of federal-state power created by Congress in the two federal statutes that deal specifically with the protection of that region, the Coastal Zone Management Act (CZMA) and the National Flood Insurance Act (NFIA). These statutes, Shanty Town contends, allocate to the

---

**13.** Our conclusion is bolstered by § 511(c)(1) of the FWPCA, which requires EPA to comply with the provisions of NEPA in administering the construction grant program. 33 U.S.C. § 1371(c)(1). Under NEPA, federal agencies must use "all practicable means and measures" to administer federal programs in a way that does not harm the environment. *See* 42 U.S.C. § 4331.

states exclusive control over the use of land in the coastal floodplains. Before considering this argument, we think it important to note that our first obligation, when presented with a possible conflict between two federal statutes, is always to attempt to harmonize them. *See Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

■ The CZMA, 16 U.S.C. §§ 1451 et seq., was designed to encourage states to develop land-use planning programs that will preserve, protect, and restore the environment of their coastal zones. *See* 16 U.S.C. § 1452. To that end, the Act gives the National Oceanic and Atmospheric Administration (NOAA) authority to make grants to the states for the development of statewide coastal zone management plans which meet certain federal standards. *Id.* §§ 1454–55. Once a state has an approved management plan in place, the Act requires all federal agencies that conduct or support activities directly affecting the coastal zone to see that those activities are carried out in a way which is, to the maximum extent practicable, consistent with that state plan. *Id.* § 1456(c)(1).

The CZMA's legislative history makes clear that Congress intended ultimate responsibility for the regulation of land use in the coastal zones to remain with the states.[14] Had EPA used its power to attach conditions to Title II grants directly to regulate land use in the West Ocean City area—as, for example by requiring West Ocean City to adopt an ordinance banning all development in the coastal floodplain—there might be an argument that its action was inconsistent with the CZMA. But

these grant conditions do not actually forbid development in the West Ocean City area; they simply forbid the use of *federal funds* to encourage such development. West Ocean City remains free to authorize development of the coastal zone, and to provide such development with service from any sewage facility not constructed with federal funds. For this reason, we conclude that these grant conditions are not inconsistent with the CZMA's general allocation of control over land use in the coastal zone to the states.

Nor can EPA's imposition of these grant conditions be said to violate the CZMA's consistency requirement. Indeed, they have been approved by the appropriate state officials as being entirely consistent with the Maryland Coastal Zone Management Plan. *See* May 5, 1982 Letter from Sarah Taylor (Director, Coastal Resources Div., Tidewater Admin., Md. Dept. of Natural Resources), to John C. Milnor (Chief, EPA Div. of Grant Project Management) (May 5, 1982) ("The [federally] funded grant system is consistent with the Coastal Zone Management Program and preferable from this Program's standpoint ... [to] [t]he locally funded system [which] ignores restrictions on growth and sewer service within the 100–year floodplain."). J.A. 206–07.

Finally, nothing in the CZMA indicates that Congress intended it to prevent EPA from taking action designed to protect water quality in the coastal zone under authority granted it by the FWPCA. To the contrary, § 307(e) of the CZMA expressly provides that

[n]othing in this title shall be construed ... to diminish ... Federal ... jurisdiction, responsibility, or rights in the field of planning, development, or control of water resources, submerged lands, or navigable waters, ... [or] as superseding, modifying, or repealing existing

---

**14.** This deliberate Congressional decision is well described in the Senate Report:

The Committee has adopted the States as the focal point for developing comprehensive plans and implementing management programs for the coastal zone. It is believed that the States do have the resources, administra-

tive machinery, enforcement powers, and constitutional authority on which to build a sound coastal zone management program. S.Rep. No. 92–753, 92d Cong. 2d Sess. at 5–6 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4776, 4780.

laws applicable to the various Federal agencies.

*Id.* § 1456(e). Section 307(f) of the Act further provides that:

nothing in this chapter shall in any way affect any requirement (1) established by the Federal Water Pollution Control Act, as amended ... or (2) established by the Federal Government or by any state or local government pursuant to [that Act].

*Id.* § 1456(f). These provisions make clear that the CZMA was intended to complement, rather than preempt, the protection afforded the coastal zone by the FWPCA and other federal environmental statutes. We conclude that the CZMA provides no basis for invalidating the grant conditions in this case.

■ Similarly, we find no conflict between these grant conditions and the NFIA, 42 U.S.C. §§ 4001 et seq. The NFIA was designed to minimize flood damage by controlling development in the coastal floodplains area. 42 U.S.C. § 4001(e). It is true that Congress chose not to regulate floodplain development comprehensively at the federal level, but instead to provide incentives for local governments to adopt such regulations themselves, by denying various forms of federal financial assistance—including federal flood insurance—to communities that failed to adopt development restrictions meeting federal standards. *See id.* §§ 4002, 4022.

There is, however, nothing in the language or legislative history of the NFIA to indicate that Congress intended it to prevent EPA from taking action designed to protect water quality in the floodplains region, pursuant to authority granted it under the FWPCA. Accordingly, we conclude that the NFIA provides no basis for invalidating these grant conditions.

**B**

■ We turn, finally, to a consideration of whether EPA's decision to impose the challenged grant conditions was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this determination,

the court must engage in a "substantial inquiry" into the agency's decisionmaking process, to determine "whether [its] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). The court may not, however, substitute its own judgment for that of the agency which Congress entrusted with the responsibility of weighing these competing factors. *See id.*

Shanty Town has cited only one case holding that EPA abused its discretion in imposing conditions on a grant under Title II of the FWPCA. *Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3d Cir.1983). In that case, as here, EPA had imposed a condition that the grant recipient agree to limit the access of new development to the federally-funded sewage facility. As the district court noted, however, *Cape May Greene* is distinguishable on several important grounds.

First, the grant conditions imposed in *Cape May Greene* were flatly inconsistent with the state's interpretation of its own federally-approved Coastal Zone Management Plan. The conditions required the municipality receiving the grant not only to deny new developments in the floodplain access to the federally-funded sewer system, but also to forbid those developments to utilize any *other* means of wastewater disposal, public or private, which made development of the plaintiff's floodplain property virtually impossible. But the state agency responsible for administering the state's Coastal Zone Management Plan had already issued a permit authorizing the plaintiff to build on his floodplain property. The EPA grant conditions therefore clashed directly with the state's administration of its federally-approved Coastal Zone Management Plan. The Third Circuit specifically grounded its finding that EPA had acted arbitrarily and capriciously on its failure to give sufficient weight to the CZMA's admonition that federal actions in the coastal zone should, to the maximum ex-

tent possible, be consistent with the state's management plan. *Id.* at 190–91.

Second, and more critically, the conditions EPA imposed in *Cape May Greene* were not directly related to the goals of the FWPCA. The use restrictions imposed there were not designed to protect water quality from nonpoint source pollution, but to reduce flooding, which is not a concern of the FWPCA. In finding EPA's action to be arbitrary and capricious, the Third Circuit placed special emphasis on the fact that flood control was not a factor it was authorized to consider by the FWPCA. *See id.* at 186–87, 190 & n. 15.

In this case, by contrast, the state agency that administers Maryland's Coastal Zone Management Plan has specifically approved these grant conditions as consistent with the goals of that plan. Moreover, the conditions are directly related to the FWPCA's goal of improving water quality, for EPA has made an express factual finding—a finding which is entitled to considerable deference—that they were necessary to prevent construction of the West Ocean City facility from leading to an overall decline in the area's water quality. For these reasons, we conclude that EPA did not act arbitrarily and capriciously in deciding to impose these conditions upon the West Ocean City grant.

## V

For the reasons set forth above, the judgment of the district court granting summary judgment for the defendants is affirmed.

AFFIRMED.